BERNARD P. WOLFSDORF
CA Bar No. 107657
Wolfsdorf Rosenthal, LLP
1416 2nd Street
Santa Monica, CA 90401
Tel: (310) 570-4088
bernard@wolfsdorf.com

Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| Shrey Shrivastava,<br><br>Plaintiff,<br><br>v.<br><br>Marco Rubio, Secretary, U.S. Department of State,<br><br>Defendant. | C/A No.: 8:25-cv-1639-AH-ADS |

## FIRST AMENDED COMPLAINT

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), Plaintiff now files this amended complaint as of right and alleges as follows:

Defendant U.S. Department of State ("DOS") is using pretext to indefinitely delay a final decision on Plaintiff Shrey Shrivastava's ("Shrey") H-1B visa application. Admittedly, Shrey got three DUIs between Christmas Eve of 2018 and October 2023. But Shrey quit drinking. In fact, as a condition of probation, Shrey has worn a "SCRAM" bracelet for at least the last 18 months. A SCRAM bracelet provides 24/7 transdermal alcohol testing. The bracelet has never recorded the presence of any alcohol because, again, Shrey quit drinking.

DOS however refuses to consider the results of the SCRAM bracelet as proof that he quit drinking. Instead, it required Shrey to do a medical panel in India, requiring a test for alcohol. Shrey did the panel and it identified no alcohol in Shrey's system. Then DOS required three months of random alcohol testing. Shrey's attended two random tests and passed them. His last test should be before the new year. But DOS will still refuse to make a final decision because the delay is not related to any concern about Shrey's alcohol use; Shrey has shown them repeatedly through various means that he quit drinking.

Rather, the delay is part of the general distaste the current administration has for H-1B nonimmigrants. And this animus renders Shrey's seven-month adjudication delay unreasonable. This Court should therefore compel the Defendants to issue a final decision.

**PARTIES**

1. Plaintiff Shrey Shrivastava is a citizen and national of India. Currently, he is stuck in India, but he is domiciled in Huntington Beach, California.

2. Defendant Marco Rubio is the Secretary of the U.S. Department of State. In his official capacity, Defendant is charged with issuing all immigration benefits abroad at consulates including the Chennai Consulate.

**VENUE AND JURISDICTION**

3. This Court has jurisdiction over this case under 28 U.S.C. § 1331.

4. Under § 1331, this Court can hear causes of action for unreasonable delays on required, discrete duties.

5. Under § 1331, this Court can also enter declaratory relief under 28 U.S.C. § 2202.

6. Venue is proper in this division and district because Mr. Shrivastava is domiciled in this District and Division.

7. DOS argues that Shrey cannot establish venue in this district or *any* U.S. District Court because he is an H-1B nonimmigrant and nonimmigrant's are disallowed to have immigrant intent. ECF No. 17. But an H-1B is a dual intent visa; in other words, Shrey can intend to live permanently in the United States and intend to be here temporarily. 8 C.F.R. § 214.2(h)(16)(i).

8. Further, DOS has a "90-day" rule. Under the 90-day rule, if a non-citizen engages in conduct inconsistent with nonimmigrant intent within 90 days of admission, DOS presumes the nonimmigrant misrepresented their intent at the time of admission. 9 FAM § 302.9-4(B)(3)(g). But after 90 days, "no automatic presumption of willful misrepresentation arises" because a noncitizen's immigrant intent can change lawfully after 90-days. *Id.* at § 302.9-4(B)(3)(g)(3).

9. Because Shrey is permitted to have both nonimmigrant and immigrant intent and DOS recognizes a nonimmigrant can lawfully change their intent after three months of presence, Shrey can establish venue here because he is domiciled in Huntington Beach, California.

10. He still owns a car with insurance that is the driveway of his apartment in Huntington Beach, California.

11. He can move back into his old apartment at any time.

12. He continues to have bank accounts in the United States.

13. He still has belongings in the United States in Huntington Beach.

14. He is domiciled in Huntington Beach, CA. And thus, venue in this district is proper.

15. Further, Plaintiff has fully exhausted all administrative remedies.

16. The doctrine of consular non-reviewability does not apply to this case because Plaintiff does not challenge a final decision by a consular officer denying a visa. *See Nine Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the United States v. Kerry ("Nine Iraqi Allies")*, 168 F. Supp. 3d 268, 290 (D.D.C. 2016) ("[T]he doctrine of consular nonreviewability

is not triggered until a consular officer has a made a decision with respect to a particular visa application."). Rather, Mr. Shrivastava challenges the agency's delay and refusal to act on his nonimmigrant visa. *Id*. *See also*, *Amir Hossein Khazaei, et al, v. Antony J. Blinken*, No. 1:23-cv-01419-JEB, ECF No. 9 at 9 (D.D.C. Sep. 18, 2023).

17. DOS has a required, discrete duty to review and adjudicate all nonimmigrant visa applications. *Kaufman v. Mukasey*, 524 F.3d 1334, 1338 (D.C. Cir. 2008); 8 U.S.C. § 1202(d) ("All nonimmigrant visa applications *shall* be reviewed and adjudicated by a consular officer.") (emphasis added).

## LEGAL BACKGROUND

16. Noncitizens seeking a visa to lawfully enter the United States are divided into two categories: 1) immigrants; and 2) nonimmigrants. 8 U.S.C. §§ 1101(a)(15). An immigrant is defined within the INA as any noncitizen who does not fall within the specified nonimmigrant categories. 8 U.S.C. §§ 1101(a)(15)(A)-(V).

17. Immigrants are generally "lawfully admitted for permanent residence," which "means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." 8 U.S.C. § 1101(a)(20).

18. By contrast, nonimmigrants are admitted for specific, temporary periods and must depart upon expiration of the period. 8 U.S.C. §§ 1101(a)(15)(A)-(V).

19. "The term 'nonimmigrant visa' means a visa properly issued to an alien as an eligible nonimmigrant by a competent officer as provided in this chapter." 8 U.S.C. § 1101(a)(26).

20. "The term 'immigrant visa' means an immigrant visa required by this chapter and properly issued by a consular officer at his office outside of the United States to an eligible immigrant under the provisions of this chapter." 8 U.S.C. § 1101(a)(16).

21. Congress created numerous nonimmigrant visa categories and sub-categories, ranging from the "A" visa for an "ambassador, public minister, or career diplomat or consular officer who has been accredited by a foreign government," to the "F" and "M" student visas, to the "H" visa, encompassing high-skilled, low-skilled, and agricultural temporary workers, to the "O" visa for individuals who possess "extraordinary ability in the sciences, arts, education, business, or athletics." Nonimmigrant visa categories span the entire alphabet, some with sub-categories of visas, and each with a particular purpose. *See* 8 U.S.C. § 1101(15)(A)-(V).

22. The Immigration and Nationality Act, as amended (INA), provides for the classification of temporary, skilled foreign workers in H-1B status to perform services for United States employers in specialty occupations. *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b).

23. A foreign national outside the United States may use the employer's approved H-1B nonimmigrant petition from USCIS to apply for a nonimmigrant visa at a United States Consulate overseas. *See* 8 U.S.C. §§ 1201(a)(1)(B), 1202(c); 22 C.F.R. §§ 41.53(a)(2), 41.101(a).

24. The foreign national must then present the approved nonimmigrant visa to an immigration officer at a port of entry to apply for "admission" to the United States. *See* 8 U.S.C. §§ 1101(a)(4); 1225(a)(3); 8 C.F.R. § 235.1(a), (f)(1).

25. Once the foreign national is inspected and authorized by an immigration officer to enter, the foreign national is deemed "admitted" to the United States. *See* 8 U.S.C. § 1101(a)(13)(A).

26. An initial approved petition to classify a foreign national in H-1B status may not be granted for a timeframe greater than three years. 8 C.F.R. § 214.2(h)(9)(iii)(A)(1).

27. An employer may file a petition to extend the stay of an H-1B nonimmigrant worker beyond the three-year timeframe granted in the employer's initial petition by filing an extension of status petition with USCIS using Form I-129. 8 C.F.R. § 214.2(h)(15)(i), (ii)(B).

28. Overall, absent rare circumstances where the interview is waived, an interview with a consular officer is required to decide a nonimmigrant visa at the time of the interview. 22 C.F.R. § 41.102(a).

29. A consular officer "must . . . properly and promptly" process a visa application, 22 C.F.R. § 41.106, and either "'issue' or 'refuse' a completed visa application." 22 C.F.R. § 41.121(a).

30. While 8 U.S.C. § 1201(g) provides that "[n]o visa . . . shall be issued to an alien if . . . it appears to the consular officer ... that such alien is ineligible to receive a visa or other such documentation under section 1182," by statute, all immigrant and nonimmigrant "visa applications *shall* be reviewed and adjudicated by a consular officer." 8 U.S.C. §§ 1202(b), (d) (emphasis added).

31. "When a consular officer knows or has reason to believe a visa applicant is ineligible and refuses the issuance of a visa, he or she must inform the alien of the ground(s) of ineligibility (unless disclosure is barred under INA 212(b)(2) or (3)) and whether there is, in law or regulations, a mechanism (such as a waiver) to overcome the refusal." 22 C.F.R. § 42.121(b)(1).

32. "The officer shall note the reason for the refusal on the application. Upon refusing the nonimmigrant visa, the consular officer shall retain the original of each document upon which the refusal was based, as well as each document indicating a possible ground of ineligibility, and should return all other supporting documents supplied by the applicant." *Id*.

33. DOS's Foreign Affairs Manual states that "For an INA 221(g) NIV refusal, you may draft the refusal letter in the way you deem appropriate and without Department approval. However, the letter must:(a) Explicitly state the provision of the law under which the visa is refused." 9 FAM 403.10-3; *Rashidian v. Garland*, No. 23-cv-01187, 2024 WL 1076810, at *5 (D.D.C. Mar. 8, 2024); *Kahbasi v. Blinken*, No. 23-cv-01667, 2024 WL 3202222, at *5 (D.D.C. June 27, 2024); *Ameer v. Schofer*, No. 23-cv-03066, 2024 WL 2831464, at *4 (D.D.C. June 4, 2024); *Vulupala v. Barr*, 438 F. Supp. 3d 93, 100 (D.D.C. 2020).

**FACTS**

34. Plaintiff Shrey Shrivastava ("Shrey") was born and raised in India in a household that survived on discipline and sacrifice rather than wealth.

35. While his family was not destitute, every advancement required careful calculation, debt, and personal deprivation.

36. For Shrey's early childhood milestones, including his third birthday, his parents could not afford a traditional cake and instead prepared a homemade dessert using the only ingredients within reach. Even celebrations reflected the family's financial limits.

37. Shrey lived in an affluent neighborhood not by fortune, but by circumstance: his father secured a rare government guest-house accommodation through persistence alone.

38. Shrey grew up surrounded by visible wealth that he did not share.

39. Shrey did not leave India until adulthood

40. Shrey's parents routinely stretched themselves beyond their means, taking on loans they could barely service to ensure their children had access to education. Their sacrifices were constant, deliberate, and unsustainable without strain.

41. Watching his parents bear this burden forged in Shrey a singular mindset: nothing would be given, and everything would have to be earned. Failure was not an option because there was no safety net.

42. In or around 2013, at age seventeen, Shrey set his sights on studying in the United States. Nearly everyone around him believed the goal was impossible—not because he lacked ability, but because the family lacked money.

43. Shrey pursued the United States not for comfort or status, but because he believed it offered something rare: a system where effort could outweigh origin, and where background would not predetermine destiny.

44. Shrey confined himself to his room after school, studying relentlessly for exams and applications. He applied to fourteen universities and was accepted to thirteen, securing multiple full-tuition scholarship offers.

45. Shrey chose Texas Tech University after a family acquaintance—someone who had not spoken to Shrey's mother in nearly twenty years and had never met Shrey—agreed overnight to cosign a life-altering loan.

46. That single act of trust made Plaintiff's education possible.

47. Shrey entered the United States at eighteen years old, accruing approximately $100,000 in debt and knowing no one.

48. He adapted quickly, completed a Bachelor of Science in Computer Science, and built a life from scratch.

49. After graduation, Shrey secured employment as a software developer in Texas and immediately began repaying his debt. Financial pressure was constant, and Shrey lacked the guidance that often accompanies first-generation success.

50. Shrey made serious mistakes, including three arrests for driving under the influence ("DUI"). He does not minimize these offenses and has accepted responsibility at every stage. He completed probationary requirements without violation.

51. As part of later supervision, in June of 2024, Shrey was ordered to wear a SCRAM alcohol-monitoring device—an unforgiving system in which even a single drink is instantly detected and reported.

52. Shrey has complied flawlessly with continuous alcohol monitoring for approximately eighteen months. The record is not aspirational; it is verified, electronic, and complete.

53. During this period, Shrey achieved sustained sobriety, rebuilt his health, stabilized his finances, and restored professional momentum. The structure that once felt punitive became transformative.

54. By the end of 2024, Plaintiff's life had finally leveled. For the first time in years, progress replaced survival.

55. In early 2025, that stability collapsed when Shrey's father suffered a severe, life-threatening stroke in India.

56. Shrey had not seen his parents in *years*.

57. Shrey's father, age sixty-nine, and mother, age sixty-three with her own medical issues, had no practical support.

58. Shrey's sister resides in Canada, and cultural norms place responsibility for parental care squarely on him.

59. Shrey faced an impossible choice: remain in the United States and abandon his parents during a medical crisis or return to India knowing his immigration status carried risk.

60. He chose family.

61. Shrey traveled to India with the intention of returning within weeks.

62. When his father stabilized, he applied for a nonimmigrant visa (H-1B).

63. DOS assigned his DS-160 receipt number AA00ELB2CX.

64. Based on his DS-160, he then scheduled a visa interview at the U.S. Consulate in Chennai, India ("Chennai Consulate") for May 9, 2025.

65. Mr. Shrivastava attended the interview.

66. Rather than deciding his case, the consular officer withheld any decision and instead informed Mr. Shrivastava his application would be put through additional administrative processing: "Your application requires additional administrative processing. The application will be reconsidered when administrative processing is complete." AP Notice at 1 [ECF No. 1-1].

67. DOS typically decides these cases in 3 days. Shrey has been waiting nearly seven months.

68. Each passing month threatens Shrey's employment in the United States and dismantles a career built through a decade of persistence and discipline.

69. More dangerously, the delay places Shrey in legal limbo.

70. Probation assumes physical presence.

71. But Shrey cannot attend hearings, comply with sudden in-person requirements, or defend himself if proceedings arise while he is trapped abroad.

72. A warrant issued under these circumstances would not reflect misconduct, but geography. It would irreparably damage Shrey's future, despite years of verified compliance and rehabilitation.

73. Shrey's intent to comply is beyond dispute.

74. He attempted to return to the United States to finish probation rather than evade it—conduct inconsistent with flight and consistent with responsibility.

75. Meanwhile, Shrey's parents depend on him financially for medical care and daily living expenses. With his income disrupted, their vulnerability deepens each month.

76. The prolonged isolation, uncertainty, and forced separation from Shrey's life, work, and community have inflicted severe emotional distress, even as he remains sober and compliant.

77. Shrey is not seeking indulgence. He seeks a fair chance to return, to complete what the court required, to keep his job, and to care for aging parents who have no one else.

78. The ongoing delay threatens permanent harm—legal, financial, and human—not because Shrey failed, but because he is unable to move.

79. Since May 9, 2025, the Chennai Consulate has not made a final decision on his DS160.

80. This notice cannot be a refusal because it does not explicitly state the provision of the law under which the visa was refused.

81. The consulate has yet to make final decisions on Mr. Shrivastava's pending application.

82. Mr. Shrivastava remains stranded in India and is unable to work for his US Employer.

83. This delay hurts Mr. Shrivastava.

84. First, this is hurting Mr. Shrivastava's career. If he is not able to return to his job soon, his employer will terminate him and he will lose his H-1B sponsorship.

85. Second, Mr. Shrivastava has active legal cases ongoing in the United States, which require his presence. He has been able to get extensions thus far, however, it is unclear how long he will be able to extend his obligations which require his physical presence in the United States. If DOS does not make a decision soon, it will force him to violate probation in Texas by no fault of his own.

86. Third, Mr. Shrivastava is suffering serious stress and mental anguish. Every day he hears nothing from the Consulate is another day closer to losing his job and suffering serious legal consequences in the United States.

87. A majority of nonimmigrants at Chennai get their visa decisions immediately. The Chennai Consulate has taken nearly three months.

88. The ongoing delay threatens permanent harm—legal, financial, and human—not because Shrey failed, but because he is unable to move.

89. This delay is unreasonable.

**FIRST CAUSE OF ACTION**
**(APA – Unlawful Withholding)**

90. DOS is unlawfully withholding final action on Plaintiffs' visa petitions because it has failed to make a final decision.

91. The Administrative Procedure Act ("APA") requires Courts to compel unlawfully withheld agency and unreasonably delayed agency action: "The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706.

92. This broad mandate is limited to "discrete" and "required" agency actions. *Norton v. S.W. Utah Wilderness All.*, 542 U.S. 55, 61 (2004) (hereinafter "*SUWA*").

93. An "unlawful withholding" claim is distinct from an "unreasonable delay" claim. *See generally Forest Guardians v. Babbitt*, 174 F.3d 1178, 1189-91 (10th Cir. 1999).

94. An unlawful withholding claim provides a remedy to two types of agency inaction: (1) a violation of a statutory or regulatory deadline; or (2) a wholesale refusal to take required action. *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987).

95. The latter occurs when "agency recalcitrance is in the face of a clear statutory duty or is of such magnitude that it amounts to an abdication of statutory responsibility[.]" *Pub. Citizen*

*Health Rsch. Grp. v. Comm'r, Food & Drug Admin.*, 740 F.2d 21, 32 (D.C. Cir. 1984). The APA strips courts of discretion to determine whether an unlawful withholding is "unreasonable"; instead, a "reviewing court must compel the action unlawfully withheld." *Forest Guardians*, 828 F.2d at 1190.

96. By holding this application in a seemingly indefinite period, DOS has violated its own rules and regulations.

97. The Consulate is required to issue or refuse a visa at the consular interview: "An NIV must be issued or refused in all cases once an application has been made, except when the Secretary has ordered you to discontinue issuing visas under INA 243(d)." 9 FAM 403.10-2(A).

98. It has not made a decision on the DS-160.

99. Even where DOS's online system claims a visa has been refused, it actually means it is in administrative processing and no final decision has been made.

100. On March 5, 2020, the Department simply decided to start describing "administrative processing" as "refusals":

> **Visas: CEAC Case Status Change**
>
> Last Updated: March 5, 2020
>
> On March 3, 2020, the Department of State made an update to the Consular Electronic Application Center (CEAC) website, our online portal for visa applicants. A visa applicant whose case previously displayed as being in "Administrative Processing" on his or her case status page now displays as being "refused."
>
> There has been no change in such applicants' actual cases. This is an administrative change to more accurately communicate case status to applicants.

101. The Department's renaming pending applications as "refused" does not render its interim decisions final.

102. No document provided to Plaintiffs indicates a reason for any denial, despite the incredibly low standard for providing such a reason.

103. Thus, no final decision has been made, in direct violation of DOS's own regulations.

104. By violating its own procedures, DOS is unlawfully withholding Plaintiff's visa.

**SECOND CAUSE OF ACTION**
**(APA – Unreasonable Delay)**

105. DOS is unreasonably delaying final agency action on Plaintiff's pending DS-160.

106. An unreasonable delay claim is a totality of the circumstances test to determine whether the delay is reasonable under the circumstances. *See, e.g., Telecommunications Research & Action Ctr. v. FCC ("TRAC")*, 750 F.2d 70 (D.C. Cir. 1984).

107. DOS has no rule of reason or processing logic to ensure timely adjudication of petitions.

108. Rather, DOS typically issues visas within 3 days of an interview.

109. DOS has no internal guidelines on how long it should take to issue a final decision for a case that it has put in to "administrative processing."

110. This shows that there is no attempt to create a rule of reason and it is just made up as Defendant goes along.

111. DOS does not track the length of these petitions and therefore has no way to ensure they are decided in a timely fashion.

112. DOS's processing logic is at least partially illegal as it provides no basis for the delay in violation of its own regulations.

113. Congress did not intend for nonimmigrant visa adjudications to take nearly 7-months.

114. In fact, Congress made it clear that preventing gaps in employment was a priority for the American Competitiveness Act of 2001 and the American Competitiveness and Work Force Initiative Act.

115. These delays harm Plaintiff.

116. Plaintiff is unable to work in the US and is stranded in India.

117. The delay is stopping job growth and interrupting their careers.

118. Further, Plaintiff has legal obligations in the United States that he is missing.

119. Compelling a decision would not harm DOS. They have dozens of consular officers and they make hundreds of decisions a day. Further a second interview is not necessary. DOS can approve and issue the visas without any new applications or interviews.

120. DOS has decided hundreds of applications that were filed after Shrey sent in his application.

121. DOS has seemingly created a policy over the past few years, especially for Indian nationals, to place cases in the black hole that is administrative processing and cause infinite delay until the applicant gives up on the case. This is bad faith and it causes these delays to be per se unreasonable.

122. These delays are substantially unjustified.

123. This Court should compel DOS to make final agency actions on the Plaintiffs' applications in 10 days.

**PRAYER FOR RELIEF**

124. Take jurisdiction over this case;

125. Declare DOS's violation of its regulation an unlawful withholding;

126. Declare all delays above as unreasonable and unlawful;

127. Order DOS to make a final decision on Plaintiff's pending nonimmigrant visa applications in 10 days;

128. Award Plaintiffs attorneys' fees and costs under the Equal Access to Justice Act or another provision of law; and

129. Enter any other order necessary to ensure justice.

December 16, 2025

Respectfully submitted,

s/Bernard P. Wolfsdorf
BERNARD P. WOLFSDORF
CA Bar No. 107657
Wolfsdorf Rosenthal, LLP
1416 2nd Street
Santa Monica, CA 90401
Tel: (310) 570-4088
bernard@wolfsdorf.com

Attorney for the Plaintiff